IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:15-CV-125-FL


| | | |
|---|---|---|
| TRANSPORTATION IMPACT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| DONOVAN MARINE, INC. doing business | ) | |
| as Southern Marine, | ) | |
| | ) | |
| Defendant. | ) | |


This matter is before the court on plaintiff's motion for summary judgment (DE 32). Defendant responded in opposition and plaintiff replied. In this posture, the issues raised are ripe for ruling. For the following reasons, plaintiff's motion is denied.

## STATEMENT OF THE CASE

In amended complaint filed December 17, 2015, plaintiff asserts that defendant breached an agreement entered into between plaintiff and defendant's predecessor, Southern Marine & Personal Watercraft Supplies, Inc. ("Southern"), for provision of consulting services for transportation cost reductions. Plaintiff asserts a claim for breach of contract, and an alternative claim for unjust enrichment, seeking to recover $74,864.89 (as of April 11, 2015), plus sums accruing to date of judgment, in addition to interest.

Following a period of discovery under the court's case management order, plaintiff filed the instant motion on May 27, 2016, accompanied by a statement of material facts, appendix thereto, and memorandum of law. In support of summary judgment, plaintiff relies upon the following

materials: (1) affidavit of Neal Newhouse ("Newhouse") and exhibits thereto, (2) affidavit of John Howard ("Howard") and exhibits thereto, (3) a purchase and sale agreement between defendant and Southern, (4) an assignment and assumption of leases agreement between defendant and Southern, and (5) defendant's responses to a set of requests for admissions.

In opposition to the instant motion, defendant filed a statement of material facts, appendix thereto, and memorandum of law. Defendant relies upon the following evidentiary materials: (1) affidavit of Rick Willis[1] and exhibits thereto, and (2) affidavit of Michael Watson ("Watson") and exhibits thereto. In reply, plaintiff relies upon a supplemental affidavit of Howard, and exhibits thereto.

## STATEMENT OF FACTS

The undisputed facts, and the disputed facts viewed in the light most favorable to defendant, may be summarized as follows.

Plaintiff is a consulting firm that assists its clients with obtaining competitive pricing in their shipping contracts with small parcel carriers such as Federal Express Corporation ("FedEx") and United Parcel Service, Inc. ("UPS"). (DE 30 ¶1). Using its proprietary systems, plaintiff obtains substantial cost savings for its clients by assisting them with, among other things, contract bench marking, distribution analysis, and contract negotiations with small parcel carriers. (Id. ¶2). In exchange for its up-front consulting services, plaintiff earns a percentage of the cost savings realized by its clients, over time, as a result of its consulting services. (Id. ¶3).

---

[1] Because another individual referenced in the record is named Tracy Willis, the court uses the full name for Tracy Willis and Rick Willis throughout this order.

On August 29, 2011, Southern executed a "Transportation Cost Management Service Agreement" ("Contract") with plaintiff, for the provision of plaintiff's consulting services. (Id. ¶4). A copy of the Contract appears below:

## TRANSPORTATION COST MANAGEMENT SERVICE AGREEMENT

This is a transportation cost management agreement between Transportation Impact, LLC (hereafter referred to as CONSULTANT) with its principal place of business located at 6002-B Emerald Drive, Emerald Isle, NC, 28594 and Southern Marine Supply (hereafter referred to as CLIENT) entered into this 29th day of August, 2011. This agreement is for a term of thirty-six (36) months from the date of the new pricing programs enabled by CONSULTANT. Agreement will continue thereafter until cancelled by either party by providing a ninety (90) day notice to terminate.

### SECTION 1
CONSULTANT is a consulting company that specializes in transportation cost management. CONSULTANT will fully analyze CLIENT's transportation cost and will use its best efforts to negotiate with service providers to reduce CLIENT's overall transportation costs. CONSULTANT will make every attempt to have new transportation agreements in effect within three (3) months of the execution of this agreement. CONSULTANT will utilize service provider's electronic invoicing information and if necessary will help CLIENT convert to electronic invoicing in order to allow CONSULTANT to provide services.

CONSULTANT shall have full authority, access and authorization to submit appropriate documentation to service providers for any CONSULTANT services.

### SECTION 2
CONSULTANT'S fees for cost reduction services shall be forty (40%) percent of the savings realized as a result of CONSULTANT'S analysis and implementation of cost reduction services. Cost reduction savings are calculated by using the difference of CLIENT'S previous shipping costs, by service level, for a period of between one (1) month and three (3) months, and the negotiated service costs implemented by CONSULTANT. This shall also include any cost recovery services performed by CONSULTANT.

CLIENT shall pay CONSULTANT within fourteen (14) days after the date of the CONSULTANT'S invoice. If any payment becomes overdue, CONSULTANT may assess a five (5%) penalty of the outstanding amount of that invoice. Non payment will not release CLIENT from the terms of this agreement.

### SECTION 3
Confidentiality is very important to each party; therefore, each party warrants it will not reveal to any party, other than those deemed necessary to perform the services described herein, any information obtained in connection with this agreement or disclose to any party of the terms, provisions or conditions of this agreement. In the event CLIENT elects to have CONSULTANT negotiate as a blind party, none of the documents provided by CONSULTANT can be duplicated, copied, photographed, or allowed to leave CLIENT premises through any means. Carrier representatives may review documents at CLIENT site only.

### SECTION 4
This agreement represents the entire understanding of the parties and cannot be amended except in writing signed by both parties. All prior discussions, understandings, and negotiations are merged herein. All prior oral or written agreements are hereby cancelled. All changes, modifications or extensions to the agreement must be in writing and must be signed by CONSULTANT and by CLIENT.

CLIENT agrees that CONSULTANT provides recommendations only and maintains no decision making control over CLIENT's other activities.

Neither party will be responsible for damages for any delay or failure to perform and of the terms and provisions of this agreement arising from causes beyond its control, including but not limited to acts of God or public enemies, acts of civil or military authority, fires, riots, wars, or conditions of war, embargoes, accidents, epidemics, floods, or other unusual severe weather, breakdown or failure of equipment or software, any of which have a material, substantial, and adverse effect 'on either party's ability to perform pursuant to the terms of this agreement.

By: _____

Consultant: Transportation Impact LLC

Dated: 8 / 29 / 2011

By: _____

Client: Southern Marine Supply

Dated: 08 / 29 / 11

3

(DE 34-1 at 9).[2]

Newhouse, who is an independent contractor for plaintiff, presented the contract to Tommy Tarver ("Tarver"), who was at the time employed as corporate secretary of Southern. (DE 34-1 ¶ 11). Tarver executed the contract on behalf of Southern and then sent it to Newhouse who executed it on behalf of plaintiff. (Id.).

Beginning in July 2012, at the request of Southern's Chief Financial Officer at the time, Scott Kingsborough, plaintiff utilized its proprietary systems and provided consulting services to Southern by analyzing Southern's shipping costs, developing a strategy to obtain favorable pricing programs with Southern's small parcel carriers, and then assisting Southern with negotiating favorable pricing programs with its small parcel carriers. (DE 33 ¶15). Plaintiff's services resulted in, among other things, a new shipping agreement being reached between Southern and UPS that provided favorable pricing programs to Southern. (Id. ¶ 16).

Plaintiff maintained access to Southern's shipping accounts throughout the contract term for the purposes of monitoring them and calculating plaintiff's own compensation, which was billed to Southern, and later defendant, on a weekly basis. (Id. ¶ 17). By this arrangement, defendant placed a degree of trust in plaintiff that it would bill appropriately and not overcharge Southern or defendant. (DE 41-1 ¶¶ 15, 19).

---

[2] Citations to docket entry numbers ("DE") in the court's docket specify the page number as designated electronically by the court's electronic case filing ("ECF") system, not page numbers (if any) printed or marked on the document.

4

Based on plaintiff's analysis of Southern's UPS account history, Southern's new UPS agreement and favorable pricing programs enabled by plaintiff's services (collectively, the "Southern UPS Agreement") went into effect on or about November 14, 2012. (DE 33 ¶ 18).[3]

Defendant acquired Southern in June 2013, resulting in defendant being the sole surviving company. (Id. ¶ 20). According to the terms of defendant's Purchase and Sale Agreement ("Purchase Agreement") and Assignment and Assumption of Leases and Contracts ("Assumption Agreement") with Southern, defendant expressly assumed Southern's obligations under the Contract. (Id. ¶ 21). For a time after the acquisition, defendant kept and used the name "Southern Marine" for a division of its business and continued to communicate with plaintiff as Southern. (Id. ¶ 24).

On August 19, 2013, defendant entered into a "Carrier Agreement" with UPS with favorable pricing programs (collectively, the "Donovan UPS Agreement") that had shipping terms, discounts, and incentives that were different from the terms of the Southern UPS Agreement. (DE 41-2 ¶¶ 6-13; DE 41-2 Ex. A). The Donovan UPS Agreement applied shipping incentives to defendant's shipping accounts identified in an "Addendum A," including the following account numbers associated with a "Southern" entity:

R0W776
X7W239
21E70E
22007X
4AV361
5W0W23
EOE577

---

[3] The parties have not provided in the record at this time a copy of the Southern UPS Agreement.

(DE 41-2 Ex. A).  The last listed account also included a reference to the term "CROSSWAR[E]".  (Id.).  The Donovan UPS Agreement includes a schedule of incentives and shipping rates.  (Id.).

From August 19, 2013, forward, all of defendant's UPS shipments were governed by the terms of the Donovan UPS Agreement, which terms were not negotiated with the assistance of plaintiff.  (DE 41-2 ¶ 9).  Defendant periodically renegotiated and renewed the Donovan UPS Agreement through and including January 2, 2016.  (Id. ¶ 13).

At some point following defendant's acquisition of Southern, Newhouse on behalf of plaintiff participated in a conference call with Kingsborough and Tarver on behalf of defendant.  "During the conference call, plaintiff agreed, at defendant's request, that plaintiff would only bill defendant for the UPS accounts that were legacy Southern accounts, and not bill for defendant's other UPS accounts."  (DE 33 ¶ 25).  After Defendant's acquisition of Southern, in June 2013, defendant kept paying weekly invoices received from plaintiff through the end of April 2014, when its payments ceased.  (Id. ¶ 26).

In one time period pertinent to the instant motion, between November 23, 2013, and April 26, 2014, plaintiff's invoices included charges for UPS shipments on the same account numbers as those listed above, associated with the "Southern" entity, particularly:

R0W776
X7W239
21E70E
22007X
4AV361
5W0W23
EOE577

6

(DE 34-1, Ex. C). The last listed account, "EOE577," was an account first used for shipping in November 2013, and is referenced by the parties as the "Crossware account" (hereinafter, the "Crossware account") (DE 34-1, Ex. C; DE 33 ¶31; DE 40 at 9).

In April 2014, Michael Watson ("Watson"), a "Manager" for defendant, learned in a discussion with defendant's controller that defendant, on behalf of Southern, had been making substantial payments to plaintiff as a "percentage of shipping costs." (DE 41-2 ¶16). Upon investigation into plaintiff's billing, Watson discovered that plaintiff "had overcharged on all invoices since week ending November 23, 2013 in an amount exceeding $32,000.00," on charges associated with the Crossware account. (Id. ¶17; DE 41-1 ¶11). Shortly thereafter, Watson notified Rick Willis, "General Manager of the Fresh Water Division and former President of Southern," of the overcharge. (Id. ¶ 18).

On May 24, 2014, Tarver and Rick Willis called Newhouse "to confront [plaintiff] regarding the suspected, substantial overcharge on that account." (DE 41-2 ¶12). On May 28, 2014, Newhouse emailed Rick Willis and Tarver of the results of its investigation, acknowledging a $32,904.40 overcharge for the Crossware account, and expressing a desire to "come to a mutual agreement." (DE 34-1, Ex. C; DE 33 ¶33). Newhouse suggested in the same message that some charges associated with the Crossware account may have been billed properly because they included "surcharges we helped negotiate for you." (DE 34-1, Ex. C).

On June 6, 2014, in response to Newhouse's May 28, 2014, email, Rick Willis emailed Newhouse, copied to Tracy Willis, an employee of defendant, stating as follows:

> Hi Neal [Newhouse], Thank you for sending the information. Please issue us a check for the refund and send to Donovan Marine, 6600 Murray st. suite 1, Little Rock, Ar. 72209. Send Attn Tracy Willis. Thank you for your attention to this matter. Rick Willis

(DE 34-1, Ex. D).

As of June 7, 2014, defendant had not made any weekly invoice payments to plaintiff since May 5, 2014, which was a payment of $6,640.70, for invoice date April 19, 2014. (DE 34-2, Ex. C; see DE 40 at 10 (referring to same table for invoice totals)). As of that same date, plaintiff had invoiced defendant in the following amounts, totaling $26,384.54, which had not been paid:

| Invoice Date | Invoice Amount |
| --- | --- |
| April 26, 2014 | $3,415.12 |
| May 3, 2014 | $3,213.08 |
| May 10, 2014 | $3,549.12 |
| May 17, 2014 | $3,679.79 |
| May 24, 2014 | $5,063.60 |
| May 31, 2014 | $3,580.15 |
| June 7, 2014 | $3,883.68 |

(Id.).[4] The average invoice amount over this time period was approximately $3,700.00. (Id.). Based on this information, plaintiff believed it was very likely that applying the $32,904.40 overcharge to past due invoices for this time period, plus another two weeks of invoices, would be sufficient to extinguish the $32,904.40 overcharge owed to defendant. (DE 34-1 ¶¶ 43-44; DE 34-2 ¶¶ 29-30).

On June 23, 2014, Newhouse emailed Rick Willis, copied to Tracy Willis, stating: "We applied the credit to your open invoices for the amount of $32,904.40.  So the open invoices from

---

[4] Newhouse and Howard, in their affidavits, state that the total amount payable on June 7, 2014, was $26,700.97, an amount $316.43 more than the total used in the text above. (DE 34-1 ¶ 42; DE 34-2 ¶ 28). This additional $316.43 amount is not reflected in the verified "true and accurate" account table attached to Howard's affidavit (DE 34-2 ¶10; DE 34-2, Ex. A).  It appears that Newhouse and Howard derive their total figure of $26,700.97 from an internal statement that adds a separate line item for the April 26, 2014, invoice in the amount of $316.43, the origin of which is not explained in the record. (See DE 34-1 at 29-30; see also DE 42-1 ¶15). For purposes of this order, the court uses the total reflected in the account table rather than the amounts stated in the affidavits.

4/26-6/21 will not need to be paid. Let me know if you have any questions." (DE 34-1, Ex. E). Later, on June 23, 2014, Newhouse emailed Tracy Willis, forwarding an invoice list from Sharon Johnson, an employee of plaintiff, showing credits applied to invoices through June 14, 2014, totaling $30,312.77. (DE 41-1 at 8).

No further communication between the parties is evidenced in the record until August 14, 2014, when Samantha Coffin ("Coffin") of plaintiff's "Finance Team" emailed "ap@donovanmarine.com," copied to Newhouse and Tracy Willis,[5] stating: "Please see the attached Open Item Statement for your records. We have applied the credit as listed out in the 6/24/2014 email from Sharon Johnson. If you need any additional information from us, please let me know." (DE 41-1 at 14).

On August 18, 2014, Tracy Willis responded by forwarding a message that Rick Willis had drafted, stating:

> This company did not respond to us after large errors in invoicing. They were to send a check and never did. We were diligent in sending our checks and found a major problem in their bill to us. At that time I considered our contract null and void. We owe nothing at this time or in the future unless we agree to a new contract. Please feel free to forward this to whomever at TI.

(DE 41-1 at 14). On August 19, 2014, Newhouse emailed Rick Willis, stating: "I am not sure where the disconnect is but back in June after we spoke I sen[t] you and Tracy all of the credits and the invoices that were applied to you. As you can see below it came to over $32,000." (DE 41-1 at 12).

---

[5] The email includes two different individual email addresses: "tracyw@somarine," and "trucker@donovanmarine." (DE 41-1 at 14). It is not clear from the record whether an individual associated with defendant referenced as "Tracy Willis" in some documents is the same as an individual associated with defendant referenced as "Tracy Rucker" in other documents. (e.g., DE 34-1 at 26, 28; DE 41-1 at 14; DE 41-1 ¶¶ 5, 18). Both names appear to reference an employee or employees in defendant's finance or accounting department. For purposes of the instant order, the court presumes that the individual referenced as Tracy Willis is the same as the individual referenced as Tracy Rucker, for simplicity, where this distinction is not material to the court's analysis at present.

That same date, Rick Willis responded to Newhouse, stating: "There is no disconnect. I asked for a check and without any conversation you decided to issue credit instead. One way or the other you billed to[o] much for your service. In the meantime we have found UPS billing issues. If we need to talk give me a call." (Id.).

On August 20, 2014, Newhouse emailed Rick Willis, forwarding credits applied to invoices in June, 2014. (DE 41-1 at 8). On October 28, 2014, Newhouse emailed Rick Willis, forwarding statements and documentation showing where the credits were applied and plaintiff's open account statements. (DE 41-1 at 7). On November 7, 2014, Newhouse emailed Rick Willis, stating: "please give me an update on when we will receive payment." (DE 41-1 at 6). That same date, Rick Willis responded to Newhouse: "There is no be a payment scheduled will not be scheduled. Our business dealings have ended with the overcharges." ((Id.) (grammar and punctuation as in original)). Rick Willis believed then that plaintiff's "conduct in substantially overcharging [defendant], refusing to refund [defendant's] account and unilaterally electing to credit the account in contradiction to [defendant's] stated demand was in bad faith and that it destroyed its degree of trust in [plaintiff] and its business expectation." (DE 41-1 ¶ 19).

Plaintiff calculates that defendant owes it compensation under the Contract for the period from June 21, 2014, to November 14, 2015, in the amount of $149,182.91, inclusive of late charges in the amount of $1,834.63. (DE 34-2 ¶ 37; DE 34-2 Ex. C).

## COURT'S DISCUSSION

A.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [fact finder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter

of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.     Analysis

Plaintiff asserts it is entitled to summary judgment on its breach of contract claim based upon defendant's failure to pay it compensation under the Contract for the period from June 21, 2014, to November 14, 2015, in the amount of $149,182.91, inclusive of late charges in the amount of $1,834.63. (DE 33 ¶ 53). Defendant asserts that it owes nothing under the Contract.

Under North Carolina law, the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Crosby v. City of Gastonia, 635 F.3d 634, 645 (4th Cir. 2011) (quotations omitted). To constitute a valid contract, "the parties must assent to the same thing in the same sense, and their minds must meet as to all the terms." Boyce v. McMahan, 285 N.C. 730, 734 (1974); see Horton v. Humble Oil & Refining Co., 255 N.C. 675, 679 (1961) ("[I]t is necessary that the minds of the parties meet upon a definite proposition. There is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense.").

"Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Phillip Morris USA Inc., 363 N.C. 623, 631 (2009) (internal citation and quotation omitted). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are

to be ascertained from the language used in the instrument." Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693–94 (1949).

"Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976). If language in a contractual provision in dispute is ambiguous, by contrast, "parol or extrinsic evidence may be introduced to show what was in the minds of the parties at the time of making the contract or executing the instrument, and to determine the object for or on which it was designed to operate." Root v. Allstate Ins. Co., 272 N.C. 580, 587 (1968). However, "[n]o ambiguity . . . exists unless, in the opinion of the court, the language of the [contract] is fairly and reasonably susceptible to either of the constructions for which the parties contend." Penn. Nat'l Mut. Ins. Co. v. Strickland, 178 N.C. App. 547, 550 (2006); accord Wachovia Bank Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354 (1970).

In this case, the Contract requires plaintiff to "fully analyze [defendant's] transportation cost[s] and . . . use its best efforts to negotiate with service providers to reduce [defendant's] overall transportation costs." (DE 34-1 at 9). The Contract sets a goal to have plaintiff "have new transportation agreements in effect." (Id.). In return, defendant owes plaintiff "fees for cost reduction services" calculated to be "forty (40%) percent of the savings realized as a result of [plaintiff's] analysis and implementation of cost reduction services." (Id.) "Cost reduction savings are calculated by using the difference of [defendant's] previous shipping costs, by service level, for a period of between one (1) month and three (3) months, and the negotiated service costs implemented by [plaintiff]." (Id.).

The record reflects no genuine dispute that plaintiff negotiated for defendant a "new transportation agreement[]," as that term is used in Section 2 of the Contract, comprising the Southern UPS Agreement that went into effect on or about November 14, 2012. (DE 33 ¶ 18). The record also reflects no genuine dispute that the Southern UPS Agreement resulted in "negotiated service costs," and "cost reduction savings," as those terms are used in Section 2 of the Contract. Accordingly, in accordance with Section 2 of the Contract, starting on November 14, 2012, defendant properly owed plaintiff 40% of the savings realized as the result of the Southern UPS Agreement.

Nevertheless, defendant raises a genuine issue of material fact as to when savings realized as a result of the Southern UPS Agreement ceased. Viewing the evidence in the light most favorable to defendant, savings realized as a result of the Southern UPS Agreement ceased on August 19, 2013, when defendant entered into a new "Carrier Agreement" with UPS with favorable pricing programs (collectively, the "Donovan UPS Agreement"). (DE 41-2 ¶¶ 6-13; DE 41-2 Ex. A). Although the evidence is not conclusive in favor of defendant, it permits a reasonable inference that the Donovan UPS Agreement had shipping terms, discounts, and incentives that were different from the terms of the Southern UPS Agreement. (Id.). The Donovan UPS Agreement applied shipping incentives to defendant's shipping accounts identified in an "Addendum A," including account numbers associated with a "Southern" entity. (DE 41-2, Ex. A).

Accordingly, because the Donovan UPS Agreement contained shipping terms different from the Southern UPS Agreement, while applying to all accounts covered by the Southern UPS Agreement, (compare DE 34-1, Ex. C, with DE 41-2, Ex. A), any UPS shipping service costs incurred under the Donovan UPS Agreement were no longer "savings realized as a result of

14

[plaintiff's] analysis" and negotiation of the Southern UPS Agreement. (DE 34-1 at 9, Section 2). Therefore, under the terms of Section 2 of the Contract, after August 19, 2013, defendant no longer owed fees to plaintiff for shipments made for accounts covered by the Donovan UPS Agreement.

Plaintiff suggests that the 36 month term specified in the Contract preamble essentially locked defendant in to pay it for UPS shipments made on accounts covered by the Southern UPS Agreement. The plain language of the Contract, however, does not support this interpretation. The Contract states in its preamble that "[t]his agreement is for a term of thirty-six (36) months from the date of the new pricing programs enabled by [plaintiff]." (DE 34-1 at 9). Interpretation of this Contract term is informed by the later provisions regarding plaintiff's obligations and defendant's payment of fees under the Contract. In particular, payment is expressly limited to 40% "of the savings realized <u>as a result of [plaintiff's] analysis and implementation of cost reduction services</u> . . . and <u>negotiated service costs implemented by [plaintiff]</u>." (<u>Id.</u> at 9, Section 2 (emphasis added)).

Thus, in light of these provisions, it is possible during the 36 month term of the Contract that there may be a period or periods of time where defendant is using the negotiated service costs implemented by plaintiff, and there may be a period or periods of time where defendant is not using negotiated service costs implemented by plaintiff. Because payment of fees is contingent upon use of "savings realized as a result of" plaintiff's negotiated shipping costs, the 36 month Contract term does not in itself require payment of fees during that entire term. The 36 month Contract terms provides a definite period of time in which plaintiff can be paid, if the conditions for payment are applicable.

Thus, viewing the evidence regarding the Donovan UPS Agreement in the light most favorable to defendant, because defendant did not owe fees to plaintiff after August 19, 2013, it did

not breach the Contract by failing to pay plaintiff's invoices submitted for the time period June 21, 2014, to November 14, 2015. Summary judgment accordingly is not warranted on plaintiff's breach of contract claim. In so holding, the court recognizes that several genuine issues of fact may preclude judgment in favor of defendant at trial, as discussed below, but such issues are not properly subject to resolution upon summary judgment motion by plaintiff.

Plaintiff suggests, for example, that defendant's independent negotiation of the Donovan UPS Agreement, and failure to pay invoices submitted by plaintiff after June 21, 2014, constituted a breach of implied duty of good faith and fair dealing under the Contract. "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985). "It is a basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." Weyerhaeuser Co. v. Godwin Bldg. Supply Co., 40 N.C. App. 743, 746 (1979). However, an asserted implied term cannot be used to contradict the express terms of a contract. See Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 713 (1962) ("[A]n express contract precludes an implied contract with reference to the same matter.").

Here, nothing in the Contract precludes defendant from independently negotiating new shipping agreements, or from employing other shipping consultants. The Contract does not state that it is an exclusive consulting agreement, and to imply a duty on defendant to refrain from negotiating new shipping agreements conflicts with the limited payment terms set forth in the Contract. (See DE 41-1 at 9, Section 2). Indeed, the Contract expressly provides that plaintiff

16

"provides recommendations only and maintains no decision making control over [defendant's] other activities." (Id., Section 4).

Plaintiff nonetheless suggests that there must be some implied limitation in the Contract on use of other shipping agreements, because otherwise defendant could benefit from plaintiff's consulting services up front, and then turn around the next day and independently negotiate the same shipping terms, without making any payment to plaintiff. While plaintiff may be correct that such circumstances could constitute a breach of an implied limitation under the Contract, the record does not presently reflect that defendant did anything close to that when executing the Donovan UPS Agreement. To the contrary, it is fair to infer from the record that defendant independently negotiated a different contract, with different shipping terms and incentives, from the Southern UPS Agreement. (DE 41-2 ¶¶ 5-13; DE 41-6, Ex. A). Plaintiff cites to no authority to support reading into the Contract or the law a restriction on defendant's right to freely contract and negotiate for more favorable terms and services. Of course, if the evidence at trial shows that defendant did no more than negotiate a new UPS shipping agreement with the same discount terms as the Southern UPS Agreement, plaintiff's argument as to breach of good faith and fair dealing may be successful.

Plaintiff also suggests through its statement of facts that defendant may be bound to pay plaintiff for shipping savings on any "legacy Southern accounts," by virtue of an oral agreement following acquisition of Southern by defendant. (DE 33 ¶ 25). The significance of such an oral agreement is not addressed in the briefing. Whether there was such an oral agreement and whether such oral agreement modified or replaced the terms of the Contract present issues of fact and law that are not susceptible to resolution on the present record. See DE 34-1 at 9, Section 4 ("All

changes, modifications or extensions to the agreement must be in writing and must be signed by [plaintiff] and [defendant].").

Relatedly, plaintiff points out that defendant kept paying plaintiff for ten months after defendant negotiated the Donovan UPS Agreement, suggesting that defendant is bound to continue to pay plaintiff due to a course of performance. The court agrees that this is a significant issue of fact that may provide plaintiff a means for recovery in this action. The parties, however, have not briefed the issue whether a course of performance by defendant effectively served to modify or clarify the parties' duties under the Contract. Defendants also raise a genuine issue of fact whether and when defendant was aware that its payments to plaintiff continued, in light of the transition from Southern to defendant, and in light of the fact that plaintiff retained access to certain accounts under the terms of the Contract. (See DE 41-2 ¶¶12, 15-16; DE 41-1 ¶¶ 12-13, 16-17).

In sum, where genuine issues of fact regarding defendant's obligations to pay under the Contract preclude judgment as a matter of law on the present record, plaintiff's motion for summary judgment must be denied.

Defendant raises an alternative argument in opposition to summary judgment that provides an additional basis for denying summary judgment to plaintiff in this instance. In particular, defendant argues that it was excused from performance under the Contract after May 2014 because plaintiff materially breached the terms of its agreement by overcharging defendant for the Crossware account and then unilaterally applying the overcharge as a credit rather than paying a refund to defendant. Plaintiff contends in reply that the facts in the record preclude a finding of material breach.

18

"Rescission of contract by one party is justified if the other party commits a material breach of the contract." Sanders v. Meyerstein, 124 F. Supp. 77, 83 (E.D.N.C. 1954). "A party may pursue rescission only if 'there is a material breach of the contract going to the very heart of the instrument.'" Morris v. Scenera Research, LLC, __ N.C. __, 788 S.E.2d 154, 161 (2016) (quoting Wilson v. Wilson, 261 N.C. 40, 43 (1964)). A breach is material if the provision breached "is such an essential part of the bargain that the failure of it must be considered as destroying the entire contract; or where it is such an indispensable part of what both parties intended that the contract would not have been made with the covenant omitted." Wilson, 261 N.C. at 43.

As noted by the parties, the North Carolina Supreme court addressed a century ago the issue of material breach in the context of a contract overcharge. In Statesville Flour Mills Co. v. Wayne Distrib. Co., 171 N.C. 708, 88 S.E. 771, 773 (1916), "[t]he defendant contend[ed] that the plaintiff broke the contract by overcharging on one item as indicated in [a] statement" upon delivery of 100 barrels of flour in an overall purchase contract for 500 barrels of flour. The court held "[i]t is plain, we think, that, if this was a breach at all, it was not such a one as justified the defendant in canceling the contract." Id. The court reasoned on the facts then presented, as follows: "It seems to have been the result of a misunderstanding as to the nature of the shipments, and as soon as plaintiff discovered its mistake, in a very small amount, it agreed to rectify it, by giving the defendant credit for the amount, with leave to deduct it from the next invoice. What else could plaintiff have done?" Id.

The court further reasoned: "Defendant then owed [plaintiff] more than enough to cover the amount of the discrepancy and was fully protected, had plaintiff been insolvent, and was doubly protected, if it had complied with the contract, as it had the right, and the express permission, to deduct the amount from the next invoice." Id. "Why the defendant should have drawn for the

amount, when it was indebted to the plaintiff, in a larger amount, requires more explanation than has been given." Id.

In this case, in contrast to Statesville Flour Mills that was decided after a jury trial, there are genuine issues of material fact here that preclude judgment as a matter of law for plaintiff on the question of material breach. First among these are the issues raised previously regarding the extent of plaintiff's entitlement to bill, and defendant's obligations to pay, invoices under the Contract after August 2013, and whether the original Contract was modified by oral agreement or course of performance. If the Contract was modified, it may impact the parties' rights and obligations in a manner that reflects upon the material breach analysis. Further, if defendant did not in fact owe anything under the Contract at the time of the alleged material breach in June 2014, then comparison to Statesville Flour Mills is inapt. On the present record, where the court must proceed on the basis of facts viewed in the light most favorable to defendant showing no continuing obligation under the Contract, undertaking a material breach analysis is premature.

Moreover, proceeding for the sake of argument on the contrary assumption that defendant was obligated to pay plaintiff's weekly invoices on "legacy Southern accounts" for 36 months, (DE 33 ¶ 25), defendant has presented sufficient evidence, though minimal, to create a triable issue as to material breach. While plaintiff seeks to draw comparison to Statesville Flour Mills, there are differences that are material, viewing the facts in the light most favorable to defendant. For example, Statesville Flour Mills did not involve circumstances, as here, involving electronic account access and billing on a weekly basis for several years. (See DE 33 ¶ 17; DE 34-1 at 9, Section 1). Because of this arrangement, and because of the "consulting" relationship created by the Contract,

(id.), it can be inferred that defendant placed a degree of trust in plaintiff that it would bill correctly, and that such trust was a critical component of the Contract. (See 41-1 ¶ 19).

Related to the issue of trust between the parties, drawing inferences in defendant's favor for summary judgment purposes, defendant also unequivocally demanded from plaintiff a refund of the overcharge, and plaintiff instead unilaterally proceeded to calculate a credit to future invoices. (DE 41-1 ¶¶ 14, 16).[6] Unlike in Statesville Flour Mills, where refund of overpayment was "express[ly] permi[tted]," 88 S.E. at 773, the Contract here is silent as to mechanism for payment of refunds. (DE 34-1 at 9).

In addition, unlike in Statesville Flour Mills, which involved a single overpayment of a freight charge, the overpayment in this instance took place repeatedly over a period of approximately five months and 20 invoice cycles. (DE 34-2 at 10-11; 34-1 at 19-25). The parties dispute the relative value of the overcharges in relation to the Contract: plaintiff points to the ratio of overcharge to the total amount invoiced over the life of the Contract (11%), whereas defendant points to the ratio of overcharge to the 26 week period involving overcharges (40%). In any event, the court notes that in some weeks, savings used to calculate the overcharged account fees were higher than those of all other accounts combined. (See, e.g., DE 34-1 (January 11, 2014, invoice showing overcharged account with savings of $3,565.95, out of total savings of $5,614.71, from seven accounts)).

Viewing these facts in the light most favorable to defendant, defendant has created a triable issue of fact as to whether plaintiff was in material breach of the contract in June 2014. In so

---

[6] The court does not rely for summary judgment purposes on Watson's statement made "upon information [and] belief" regarding the contents of a telephone call made in June 2014. (DE 41-1 ¶ 15). Other evidence in the record, noted in the text above provides a sufficient basis for genuine issue of material fact as to material breach.

holding, however, the court emphasizes that the overall analysis of material breach – and the ultimate issue of defendant's right to recission – may vary under a more complete record and when assessed under a preponderance of the evidence burden of proof standard.

In sum, where defendant has presented genuine issues of material fact precluding summary judgment in favor of plaintiff, plaintiff's motion for summary judgment must be denied.

## CONCLUSION

Based on the foregoing, plaintiff's motion for summary judgment (DE 32) is **DENIED**. The parties are **DIRECTED** to confer and file within **21 days** from date of entry of this order a joint status report including the following:

1. Whether the parties desire opportunity for additional mediation or court-hosted settlement conference;

2. Three alternative preferred dates for bench trial, no jury trial having been requested;

3. Estimated trial length;

4. Whether it will be necessary to rule upon any dispute(s) if video depositions are to be used and the parties have been unable to reach agreement on editing;

5. Discussion of the nature of the parties' anticipated proposed findings of fact and conclusions of law, including areas of agreement which may obviate necessity for proof, and those issues in dispute;

6. Suggested deadline for submission of proposed findings and conclusions, which proposals shall be filed and submitted electronically to chambers on a date to be ordered in WordPerfect or Word format, to the following email address: **proposedorders_nced.uscourts.gov**; and

7.     Whether the parties request any pre-trial conference.

Upon receipt and review of this report, the court will enter such further order as is warranted regarding pre-trial and trial scheduling.

SO ORDERED, this the 26th day of October, 2016.


LOUISE W. FLANAGAN
United States District Judge